UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL T. JORDAN, | No. 2:11-cv-2438 JAM AC P |
| Petitioner, | |
| v. | FINDINGS & RECOMMENDATIONS |
| MICHAEL MARTEL, Warden, | |
| Respondent. | |

     Petitioner Michael T. Jordan is a state prisoner proceeding through counsel with a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  In 2008, petitioner was convicted in the El Dorado County Superior Court of child sexual abuse and sentenced to an aggregate term of sixteen years and eight months in state prison.  Petitioner claims his convictions should be set aside on grounds of ineffective assistance of trial counsel.  He also requests an evidentiary hearing.  The matter is fully briefed and submitted for decision.  See ECF Nos. 2, 17, 19.

     The parties agree that petitioner exhausted state court remedies by fairly presenting his ineffective assistance claims to the California Supreme Court.  Respondent raises no procedural defenses and contends that petitioner's claims should be denied on the merits.  For the reasons that follow, the undersigned recommends that the petition be denied on the merits without an evidentiary hearing.

////

////

I.   FACTUAL AND PROCEDURAL BACKGROUND

On February 5, 2007, petitioner was charged in the El Dorado County Superior Court with continuous sexual abuse of a child under fourteen years of age, in violation of Cal. Penal Code §288.5(a), and committing a lewd act upon a child of fourteen or fifteen years of age, in violation of Cal. Penal Code § 288(c). Trial by jury commenced on April 16, 2008. The following evidence was admitted. See Lodged Document[1] ("LD") 4 at 1-6; 28 U.S.C. § 2254(e)(1).

A. The Prosecution's Case

Doe, the victim, was born in 1989 and was 18 years old at the time of trial. She was four years old when her mother married petitioner, and petitioner adopted her less than two years later. The first memory about petitioner that "bother[ed]" Doe involved "bad magazines," which she explained were "[m]agazines with people with no clothes on," that were "laid out" in the home. Petitioner had a subscription to Penthouse or Playboy that was delivered to the house.

The second memory that bothered her was of petitioner "touch[ing][her]" in her parents' bed at night during the times she slept with them because she was frightened to stay alone in her room. At first, when she was about six years old, petitioner would touch her thighs with his hands. Over time, he progressed to touching her genitals. On more than 10 different nights, he would "move his penis back and forth" between Doe's legs while she was on her side lying in between him and her mother. Doe would "just lay there" and Doe and petitioner would not say a word to one another. She did not know if her mother was awake.

The next bothersome memory Doe had that "wasn't in that bed at night" began when she was seven years old. Petitioner would be sitting in his chair in the living room reading "pornographic" magazines. At first, petitioner would "just be reading [the magazines]," but over time he would "call [her] over," under the pretense of asking her a question. When she would come over as called, she "wouldn't want to talk" because she "would notice what he was looking at."

---

[1] See Respondent's Notice of Lodging Document in Paper. ECF No. 18.

When Doe was about 10 or 11 years old and her mother was at night school, petitioner would touch her genitals with his hands while the two were naked in her parents' bedroom. Sometimes he would put lotion on his genitals and "put his genitals on [her] and rub." These episodes happened more than 10 times.

In the sixth grade, Doe started to realize that petitioner's conduct was "bad." She told her mother that petitioner "wanted to have sex with [Doe]." The mother confronted petitioner, but he denied it and she believed him.

The molestation continued. Petitioner showed her how to orally copulate him and then made her do it. He also showed her how to rub his genitals with her hands and made her do that too. These episodes would also occur in her parents' bedroom in the evening when her mother was not home.

In the sixth grade, Doe started confiding in her friends that petitioner was molesting her. The first friend she told was K.P. According to K.P., a crying and barely audible Doe told her petitioner had "tried to have sex with her," but told her not to tell anybody.

The next time Doe told friends what was happening to her was during her freshman year in high school. She wrote a letter to her friend A.G. dated November 5, 2003. The letter said that petitioner had been "molesting" her, that she told her mother about it but the mother believed petitioner over her, and that she wanted A.G. to "help [her]." A.G. saved the letter and read it to the jury. Doe also told her friends O.R. and Z.K. that petitioner had been "molesting" her. Doe did not report petitioner's behavior to the police at that time because her mother was financially dependent on petitioner.

In high school, Doe became better at "fend[ing] [petitioner] off." As a result, petitioner touched her less and less, although he would grab her genitals or breasts when she walked by him. "Multiple times" when she was in high school, petitioner would call her over to the living room computer while he was using it and ask her to close out windows that showed "[n]aked people." She repeatedly showed him how to close these windows himself, but he continued to call her over to have her close them out. "[H]e had no trouble closing a normal window" such as those displaying websites about cars.

The last time petitioner touched Doe inappropriately, i.e., "grabbed [her] genitals," was on June 2, 2006, when she was walking by his chair. Later that evening, Doe was at a friend's home eating dinner and watching a movie. When Doe's mother repeatedly called Doe's cellular phone to tell her to come home, Doe refused to answer the calls. Sensing something was wrong, Doe's friend B.P. took her aside and talked to her privately. Crying, Doe told B.P. petitioner had "touched her inappropriately [on] multiple accounts since she was younger." Doe was afraid to say anything because she thought her family would "fall apart." At B.P.'s suggestion, Doe decided to talk with police. B.P. called 911, and Doe talked with police both on the telephone and at the police station. Thereafter, Doe stayed at B.P.'s house for about a week and a half. After Doe reported the molestation to police, Doe's mother initiated divorce proceedings.

The same month that Doe reported the molestation to police, Doe's mother gave their home computer to the El Dorado County Sheriff's Department. Detective David Lawrence analyzed the computer and its contents. He was a "qualified" "computer forensic expert" with 900 hours of specialized training in computer forensics, i.e., "how to remove information from a computer" "without changing anything." He retrieved the Internet browsing history of the computer covering two time periods -- two weeks in early February 2004 and four or five days at the end of May 2006 -- a random sampling which he documented in a report that was introduced into evidence.

The report covered the Internet browsing history of a user named "Mike."[2] One Web site that was accessed 17 times was "literotica.com" that had both "erotic" stories and pictures. To get to the "incest area" on that Web site, a user would have to click to that area from the site index. One could not "accident[ally]" "stumble" into this area on the Web site. Detective Lawrence found at least three "erotic stories" that "appeared to be about incest" "in their entirety still on [petitioner's] computer." He explained that "the computer went to these stories and displayed them on th[e] computer."

---

[2] Doe's mother and petitioner used the same "password" (i.e., user name) to log onto the family computer. Doe was not able to use the computer unless her mother or petitioner "let her on."

4

1       Detective Lawrence saw a "recurring pattern of Internet usage time relative to the
2  pornographic web brows[ing]." It was usually about 4:30 a.m. to 7:00 a.m. and then from 10:00
3  p.m. to midnight or 1:00 a.m. There were a few times pornographic sites were accessed outside
4  these time periods. He did not find any child pornography.

5       B. The Defense Case

6       Numerous witnesses testified on petitioner's behalf, attesting to his honesty, his lack of
7  sexually predatory behavior, his lack of familiarity with pornography, and his lack of familiarity
8  with computers. The defense also called a witness to establish that petitioner was at work on
9  March 1, 2004, at the time that Detective Lawrence testified the home computer had accessed the
10 erotica website.

11      In addition to these witnesses, petitioner testified. He typically went to bed around 9 p.m.
12 or 10 p.m. and woke up at 6:00 a.m. He did not use the Internet to access pornography and did
13 not possess pornography. Before being arrested, petitioner received a pretext telephone call from
14 Doe. She "talk[ed] about [him] touching her inappropriately" and he responded, "I don't
15 understand what you are talking about, inappropriately." After being arrested, petitioner was
16 asked by police whether he had received a pretext telephone call from Doe. He lied and said he
17 had not. Petitioner denied touching Doe's breasts inappropriately and denied engaging in oral
18 copulation with her.

19      C. The Verdict And Post-Conviction Proceedings

20      On April 23, 2008 the jury found petitioner guilty on both counts. With representation by
21 different counsel, petitioner filed a motion for new trial and a renewed motion for new trial
22 asserting, among other things, ineffective assistance of counsel. The trial court denied both
23 motions. On April 17, 2009, the court sentenced petitioner to serve sixteen years and eight
24 months in state prison.

25      Petitioner appealed to the California Court of Appeal, Third Appellate District. While his
26 direct appeal was pending, he filed habeas corpus petitions in both the court of appeal and the
27 superior court; those petitions were denied. On July 14, 2010, the court of appeal affirmed the

28

5

convictions. On September 29, 2010, the California Supreme Court denied a petition for review presented on petitioner's behalf.

Petitioner filed this federal action on September 15, 2011.

## II. STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71−72 (2003). Clearly established federal law also includes "the legal principles and standards flowing from precedent." Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)). Only Supreme Court precedent may constitute "clearly established Federal law," but circuit law has persuasive value regarding what law is "clearly established" and what constitutes "unreasonable application" of that law. Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044, 1057 (9th Cir. 2004).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." Benn v. Lambert, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407−08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520−21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." Williams, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. See, e.g., Williams, 529 U.S. at 397−98; Wiggins, 539 U.S. at 526−28 & 534; Rompilla v. Beard, 545 U.S. 374, 388−909 (2005); Porter v. McCollum, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. Lockyer, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. Panetti v. Quarterman, 551 U.S. 930, 953 (2007). Even a general standard may be applied in an unreasonable manner. Id. In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. Id. at 948.

Relief is also available under AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination. 28 U.S.C. § 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court. Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). See, e.g., Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (rejecting credibility finding as unreasonable in light of the evidence before the state court).

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." Williams, 529 U.S. at 412. To prevail,

1  therefore, a habeas petitioner must establish the applicability of one of the § 2254(d) exceptions
2  and also must also affirmatively establish the constitutional invalidity of his custody under pre-
3  AEDPA standards.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  There is no single
4  prescribed order in which these two inquiries must be conducted.  Id. at 736−37.  The AEDPA
5  does not require the federal habeas court to adopt any one methodology.  Lockyer v. Andrade,
6  538 U.S. 63, 71 (2003).

   III.   PETITIONER'S INEFFECTIVE ASSISTANCE CLAIMS

   A.   Petitioner's Allegations

   Petitioner alleges that trial counsel Steve Tapson committed three prejudicial errors which constituted ineffective assistance.  Specifically, counsel (1) failed to hire a computer expert; (2) failed to request CALCRIM 332, the expert witness instruction; and (3) failed to request CALCRIM 375, the prior bad acts instruction.  ECF No. 34 at 34−35.  Petitioner argues that counsel's alcohol use during trial contributed to, or explains, each of these errors.  Id. at 34.

   B.   The Clearly Established Federal Law Governing The Claims

   To establish a violation of the Sixth Amendment based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 692, 694 (1984).  In evaluating counsel's performance, the court applies a strong presumption that counsel's representation fell within the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 689.  Counsel's strategic choices are generally accorded deference, but only if those decisions are reasonable and are based on reasonable investigations, research, and judgments.  Id. at 690–91; see also Jones v. Wood, 114 F.3d 1002, 1010 (9th Cir.1997) (strategic choices are not immune from challenge-they must be reasonable); Jennings v. Woodford, 290 F.3d 1006, 1014 (9th Cir.2002) (to be reasonable, tactical choices require sufficient evidentiary basis).

   Prejudice means that the error actually had an adverse effect on the defense.  There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Id. at 693–94.  A reasonable probability is a probability sufficient to undermine

confidence in the outcome.  Id .  A reviewing court need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong.  Strickland, 466 U.S. 668 at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 689.

     C.   The State Court's Adjudication Of The Claims

Petitioner's claims were adjudicated on the merits on direct appeal.  Because the state supreme court denied discretionary review, the opinion of the California Court of Appeal is the adjudication that must be reviewed for reasonableness under § 2254(d).  See Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).  Because the appellate court adjudicated the claim in a reasoned opinion, review under § 2254(d) is confined to "the state court's actual reasoning" and "actual analysis." Frantz, 533 F.3d at 738.

The court of appeal identified Strickland as the governing law (see LD 4 at 14), and rejected petitioner's claims of ineffective assistance:

> Defendant contends Tapson was ineffective for failing to hire a computer expert.  In a declaration supporting defendant's original motion for new trial, Tapson stated he "did not feel that a computer expert was called for" "[a]s a result of extrinsic evidence that defendant was not home during some of the viewing of the questionable websites." "In hindsight [he] should have hired an expert to evaluate the computer hard drive seized from defendant's home to assist [him] with the trial."
>
> That in hindsight Tapson would have done things differently does not prove his representation of defendant was deficient. What is relevant is whether trial counsel's decision not to hire a computer expert was a rational trial tactic. (People v. Zapien (1993) 4 Cal.4th 929, 980.)  It was. As Tapson explained, he decided to challenge the expert's testimony using evidence that defendant was not home when some of the pornography sites were accessed.  And as the trial court explained in denying the original motion for new trial, Tapson used other strategies to undercut the expert's testimony such as the fact other people in the house had access to the computer, defendant had poor computer skills, and he was not awake late at night when some of the pornography was accessed.

LD 4 at 18.

> Defendant contends Tapson was ineffective for failing to "address the court's failure to give CALCRIM No. 332 to the jury." Tapson was not ineffective because, as we have explained in part III of the

> Discussion, the failure of the court to so instruct was harmless.[3] Defendant therefore cannot establish the second prong of an ineffective assistance claim, i.e., prejudice.

LD 4 at 19.

> Defendant contends Tapson was ineffective for failing to request the court instruct pursuant to CALCRIM No. 375 on prior act evidence. The prior acts that defendant takes issue with were introduced through Detective Lawrence's testimony and related to defendant's use of his home computer to view pornography and incest stories.
>
> CALCRIM No. 375 is based on evidence admitted pursuant to Evidence Code section 1101, subdivision (b) and instructs the jury it may consider defendant's prior bad acts only for the limited purpose for which the acts were introduced (i.e., identity, intent, motive, knowledge, accident, common plan, or consent) and only if they have been proved by a preponderance of evidence. (CALCRIM No. 375.)

---

[3] In part III of the Discussion, the court of appeal held:

> ""'[T]he erroneous failure to instruct the jury regarding the weight of expert testimony is not prejudicial unless the reviewing court, upon an examination of the entire cause, determines that the jury might have rendered a different verdict had the omitted instruction been given.'"" (People v. Williams (1988) 45 Cal.3d 1268, 1320.) The jury would not have rendered a different verdict.
>
> The jurors were already instructed on how to evaluate witness testimony in CALCRIM No. 226, which told them they were the sole judges of "the credibility or believability of the witnesses," that the testimony of each witness must be judged by the "same standard," and that they were to "[c]onsider the testimony of each witness and decide how much of it you believe." The omitted instruction would have specifically referred them to this instruction. (CALCRIM No. 332 ["In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally"].) We presume the jury followed these instructions in CALCRIM No. 226, absent any contrary indication. (People v. Gray (2005) 37 Cal.4th 168, 217.)
>
> Finally, although Detective Lawrence was the only one to testify as to the forensics behind defendant's computer that corroborated Doe's version of events, his testimony was by no means the only corroboration of what had happened to Doe. Doe had confided in numerous people throughout her childhood that defendant had molested her, even leaving a letter that detailed what defendant had done. On this record, the court's error in failing to give CALCRIM No. 332 was harmless.

LD 4 at 13-14.

> Tapson was not deficient for failing to request the instruction because the prior act evidence was used not solely to prove some fact under Evidence Code section 1101, subdivision (b). It was also used to corroborate Doe's credibility. The admissibility of corroborating testimony is not addressed under Evidence Code section 1101, subdivision (b). (People v. Stern (2003) 111 Cal.App.4th 283, 296; Evid.Code, § 1101, subd. (b).) Therefore, the instruction would not have been appropriate because it would have limited the jury's consideration of the evidence to only the purposes covered by Evidence Code section 1101, subdivision (b).

LD 4 at 19−20.

> Defendant contends Tapson used alcohol, especially toward the end of trial and it "manifestly compromised his professional judgment." The evidence supporting this assertion consisted of six declarations filed with defendant's renewed motion for new trial. These declarations stated that one of Tapson's former clients smelled alcohol on Tapson when Tapson was representing that client, three of defendant's relatives thought Tapson smelled of alcohol during defendant's trial, a friend of defendant's family also smelled alcohol on Tapson during the trial, and defendant himself smelled alcohol on Tapson during trial and jailhouse visits. Of these, one declaration from defendant's relatives also stated that a red-faced Tapson "fumbled with [his] briefcase" during closing argument and "slammed it down on the ledge in front of the witness stand, all in the presence of the jury." Another one of these declarations from a relative stated he "believe[d] that alcohol affected Mr. Tapson during his closing argument," explaining as follows: the summation had no point, "was incoherent and focused on 'Mike the car guy' rather than on the weak and strong parts of the case," "Tapson dropped his briefcase on the floor in front of the jury," "he nearly fell over when he attempted to pick it up," and he spoke to the jury "with his back turned to them."
>
> These assertions are insufficient to prove counsel was ineffective. As the trial court stated in denying the renewed motion for new trial that was partly based on Tapson's alcohol consumption, "You have to show his performance fell below the standard of a reasonable competent attorney and it would have been a different verdict if he had been sober." At most, defendant has demonstrated Tapson might have smelled of alcohol during parts of the trial[4] and was clumsy and unprepared for closing argument. This is not sufficient to prove prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland v. Washington, supra, 466 U.S. at p. 694 [80 L.Ed.2d at p. 698].)

LD 4 at 23−25.

////

---

[4] The trial judge noted that he "had [Tapson] up here at the bench many times, and I didn't smell alcohol." LD 4 at 24, n.4.

D. <u>Objective Reasonableness Under § 2254(d)</u>

1. Alcohol Use

Petitioner first asserts that counsel's alcohol use during trial contributed to, or explains, his deficient performance. ECF No. 2 at 34−37. The evidence submitted to the state courts in support of this argument consisted of six declarations signed under penalty of perjury. See 2 CT (Clerk's Transcript) at 330-40. As the state court of appeal summarized, petitioner, members of his family, and a family friend collectively declared that counsel smelled of alcohol on various occasions including during jail visits with petitioner (<u>id.</u> at 337), just prior to petitioner's testimony (<u>id.</u>), following closing arguments (<u>id.</u> at 336), during lunch the day prior to the jury verdict (<u>id.</u> at 332), and after the jury returned its verdict (<u>id.</u> at 332, 335, 339−40). Two of the declarants state their belief that counsel appeared intoxicated while giving the defense's closing argument. <u>Id.</u> at 334, 340. The sixth declarant, Clayton Webb, states that attorney Tapson represented him briefly in 2008 free of charge but that Webb terminated representation due to counsel smelling of liquor on at least two occasions and appearing to have a drinking problem. <u>Id.</u> at 330.

Petitioner appears to argue that the court of appeal failed to sufficiently address or consider this evidence. ECF No. 2 at 34−37. That argument is unavailing. It is unnecessary to inquire into the source of an attorney's alleged shortcomings unless the attorney's conduct has been shown to be deficient and prejudicial. See <u>Bonin v. Calderon</u>, 59 F.3d 815, 838 (9th Cir. 1995) ("Because we conclude, as the district court did, that [counsel's] performance did not fall below the standard of objective reasonableness, it is irrelevant whether [counsel] used drugs."); <u>Berry v. King</u>, 765 F.2d 451, 454 (5th Cir. 1985) ("[U]nder <u>Strickland</u>, the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant."), <u>cert. denied</u>, 476 U.S. 1164 (1986).

The state court held that petitioner was not prejudiced by counsel's failure to request instruction with CALCRIM No. 332, and that counsel did not perform deficiently in failing to hire a defense computer expert or in failing to request instruction with CALCRIM No. 375.

Under these circumstances, <u>Strickland</u> did not require that the state court give the evidence of counsel's alcohol use any particular weight or consideration. Accordingly, the state court's adjudication of the claim(s) is not unreasonable on this ground.

### 2. Computer Expert

Petitioner claims that trial counsel was ineffective in failing to retain a defense computer expert to counter the expert testimony given by Detective Lawrence for the prosecution. Petitioner argues that Lawrence's testimony was a "critical lynchpin" supporting the jury's verdict, and that the strategy defense counsel employed instead, offering evidence that petitioner was not home when some of the illicit websites were viewed, was ineffective. ECF No. 37 at 2.

Petitioner's argument in support of this claim focuses on hindsight knowledge of the role that the computer evidence played in this case. The record before the state court contained a declaration from defense counsel stating why he did not retain a computer expert. Counsel declared:

> [] That as a result of extrinsic evidence that defendant was not at home during some of the viewing of the questionable websites, I did not feel that a computer expert was called for. In hindsight I should have hired an expert to evaluate the computer hard drive seized from defendant's home to assist me with trial.
>
> [] That a defense expert would have assisted me with understanding and confronting the prosecution's computer expert.
>
> [] That the prosecution's use of and reliance on the testimony of their computer expert played a much larger role in the course of the jury trial than I had anticipated.

1 CT at 199, ¶¶ 5-7.

Counsel's post hoc opinion that he should have hired a computer expert is of limited relevance, because counsel's conduct must be evaluated objectively based on his perspective at the relevant time and not with the benefit of hindsight. See <u>Strickland</u>, 466 U.S. at 689−90 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). As the Supreme Court has explained:

> After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. Strickland, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

Harrington v. Richter, 31 S.Ct. 770, 790 (2011) (citations omitted) (rejecting reliance on counsel's hindsight assessment of his failure to retain experts).

Counsel in this case decided not to hire a computer expert because of "extrinsic evidence that defendant was not at home during some of the viewing of the questionable websites." 1 CT at 199. Specifically, evidence was admitted at trial that the website "literotica.com" had been accessed on petitioner's home computer on March 1, 2004 "just before 3:00 in the afternoon." 1 RT at 265. Counsel called Geraldine Haas as a defense witness in an effort to establish that petitioner was at work at that time on that date. 2 RT at 346−49. Haas testified that, according to her records, petitioner was at work on March 1, 2004 except for a 30 minute lunch break. Id. at 347.

Under Strickland, the relevant inquiry is whether counsel's strategic decision was reasonable at the time it was made, and whether it was based on reasonable investigation, research and judgment. The state appellate court found that counsel's decision to rely on and present extrinsic evidence in lieu of retaining a computer expert was a rational trial tactic. In so holding, the state court further noted that counsel "used other strategies to undercut the expert's testimony." LD 4 at 18. These other strategies were summarized by the trial court in denying petitioner's original motion for new trial:

> THE COURT: [….] [¶] He tried to show that there were a couple of times during the daytime when the computer was accessed in these subject matter areas to try to search – therefore, somebody else must have accessed the computer at other times.
>
> He also made an attack on the credibility of the victim by showing what was going on in that family and the problems that she engaged in at work.
>
> He supplied multiple witnesses as to your client's reputation for honesty and truthfulness.   He raised the issue that your client is not computer literate, has very poor skills in that area.

> He said he couldn't stay awake past 9:00. From a couple of the witnesses, when the computer was accessed after midnight, then he tried to represent that the victim really loved your client, so that undermines why she would now say he had molested her.
>
> He tried to show that the other two people in the house had access to the computer, and it could have been them. He just tried to raise a reasonable doubt as to whether these crimes were committed based on all of these individual facts.

3 RT (Reporter's Transcript) at 591−92.

The state court's finding that counsel made a strategic decision is reasonably based on the record and on reasonable inferences from the record. The state court's deference to that decision is not an unreasonable application of the Strickland standard. See Richter, 31 S.Ct. at 789 (holding that trial counsel's failure to pursue particular expert assistance was not ineffective where counsel pursued an alternative defense strategy).

In Richter, the Supreme Court overturned a decision of the Ninth Circuit that had found ineffective assistance based on counsel's failure in a homicide case to consult experts on blood evidence. The Court held that § 2254(d) barred relief, because it was not unreasonable of the state court to conclude that counsel had acted within the wide range of reasonable professional assistance and had made a considered choice among alternative strategies. Such choices require deference both under Strickland itself and under § 2254(d). Richter, 131 S.Ct. at 788-90.[5] Richter dictates the result here.

Although the state court did not reach the prejudice inquiry given its finding that counsel did not perform deficiently, petitioner has additionally failed to demonstrate a reasonable probability that the outcome of trial would have been different had counsel retained a computer

---

[5] Although the Richter Court acknowledged that "[c]riminal cases will arise in which the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence," it emphasized that AEDPA requires deference to state court applications of even that principle. Id. at 788-89. In any event, this is not a case in which the only reasonable and available defense strategy required expert assistance. Richter also rejected, under Strickland and § 2254(d), the theory that trial counsel had unreasonably failed to anticipate the prosecution's use of expert testimony, or the significance of that testimony, and therefore to prepare a countering defense. Id. at 790-91 ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."). Petitioner's similar argument here is foreclosed by Richter.

1 expert. The declaration of potential expert Mark Neibauer was submitted in support of
2 petitioner's original motion for new trial. See 1 CT 200−06. Neibauer examined the computer
3 hard drive at issue and found no evidence of "so-called 'incest' literature on the defendant's hard
4 drive," or evidence of "browsing of 'incest' subject web sites." Id. at 202−204. However,
5 Neibauer specifically states in his declaration:

> … I was asked to find "incest stories" that were saved somewhere on defendant's hard drive. (See page 242 t.t.) I did not see these stories, but it does not mean they did not exist? I may have overlooked something. There is a lot to look at in a PC. Did he find these after a forensics recovery meaning they were deleted) or were they in there in an obvious location like "My Documents" folder? I did not see them?

10 Id. at 205.

11 Thus, although Neibauer was unable to recover the same information from the computer
12 as the prosecution's expert, it is unclear whether Neibauer examined the computer in the same
13 manner and using the same method as did Lawrence. Moreover, had the jury been presented with
14 Neibauer's testimony, the jury may well have attributed any difference in results to Neibauer's
15 lack of particularized expertise in the area of forensic computer examination compared to
16 Lawrence's, or to a difference in methods used. Compare 1 RT 238−40 (Detective Lawrence's
17 description of his training and expertise and method of examining the computer) with 1 CT
18 200−01 (Neibauer's description of his training and experience).

19 In any event, the prosecution's computer expert testimony was not the "lynchpin" of the
20 case as petitioner asserts. Rather, as the trial court stated in denying petitioner's renewed motion
21 for a new trial: "…[T]he evidence was overwhelming here. It may have been a 'He said/She
22 said,' but she complained to about six or seven people throughout her life that this thing was
23 happening to her." 3 RT at 610. Beginning in the sixth grade, and continuing through high
24 school, Doe confided in no fewer than six people (her mother, K.P., K.G., Z.K., O.R., and B.P.)
25 before reporting the molestation to law enforcement. See 1 RT 53, 62−65, 81, 110−11, 135,
26 159−60, 205−10. Presenting a defense computer expert would have done nothing to refute Doe's
27 testimony, buttressed by the testimony of six other individuals to whom she complained over a
28 period of several years. On this record, prejudice is not shown.

For all these reasons, the state court's disposition of this claim was not objectively unreasonable and § 2254(d) therefore precludes relief.

### 3. CALCRIM No. 332

Petitioner next claims counsel should have requested that the jury be instructed with CALCRIM 332 as follows:

> A witness was allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence….

ECF No. 2 at 39-40. Petitioner argues that counsel's failure to request this instruction compounded the error in failing to hire an expert computer witness. Id. at 40. As previously noted, the state appellate court found that any error was harmless and rejected petitioner's ineffective assistance claim for lack of prejudice. LD 4 at 19.

Petitioner's jury was instructed with CALCRIM No. 226, which addresses the evaluation of witnesses in general. 2 RT 498−500; 1 CT 116−17. CALCRIM No. 226, as given, instructed the jurors that it was their job to judge the credibility of each witness, and the instruction by its plain language clearly applied to expert witnesses and non-expert witnesses alike:

> You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate use your common sense and experience.
>
> The testimony of *each witness* must be judged by the same standard.
>
> [….]
>
> You may believe all, part, or none of *each witness*'s testimony.
>
> Consider the testimony of *each witness* and decide how much of it you believe.

RT at 498 (emphasis added). The instruction further explained that, in evaluating a witness's

17

testimony, the jurors could consider anything that reasonably tended to prove or disprove the truth or accuracy of that testimony, including how reasonable the testimony was when all the other evidence was considered and whether other evidence proved or disproved any fact about which the witness testified. 2 RT at 498.

"[J]uries are presumed to follow their instructions." Richardson v. Marsh, 481 U.S. 200, 211 (1987). CALCRIM No. 226 adequately instructed jurors that the meaning and importance of all witness testimony, including expert testimony, was for the jurors and the jurors alone to decide. In addition, as discussed, the computer forensic evidence was not the lynchpin of the case against petitioner. In light of the fact that the trial court instructed the jury with CALCRIM No. 226 and in light of the strength of the evidence corroborating Doe's testimony, the state court's rejection of this portion of petitioner's ineffective assistance claim for lack of prejudice is not contrary to, or an unreasonable application of, the Strickland standard.

### 4. CALCRIM No. 375

Petitioner likewise claims that counsel unreasonably failed to request CALCRIM No. 375, regarding prior bad acts, in regard to petitioner's use of his home computer to view pornography and incest stories. CALCRIM No. 375 provides:

> Do not consider this evidence for any other purpose [except for the limited purpose of <insert other permitted purpose, e.g., determining the defendant's credibility>].... If you conclude that the defendant committed the (uncharged offense[s]/ act[s]), that conclusion is only one factor to consider along with all the other evidence.

ECF No. 2 at 40.

The state court held that instruction with CALCRIM No. 375 was "not appropriate" as a matter of state law. LD 4 at 20. CALCRIM No. 375 addresses evidence admitted pursuant to California Evidence Code section 1101(b); however, the prior act evidence in petitioner's case was used "not solely to prove some fact under Evidence Code section 1101, subdivision (b). It was also used to corroborate Doe's testimony." Id. Instruction with CALCRIM No. 375 would have inappropriately precluded the jury from considering the evidence as corroboration of Doe's testimony. Id. This determination of state law by the state appellate court is binding on this

court. See, e.g., Bradshaw v. Richey, 546 U.S. 74, 76 (2005) "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Hicks v. Feiock, 485 U.S. 624, 629−30 (1988) (state appellate court's determination of state law is binding and must be given deference).

Since instruction with CALCRIM No. 375 was not warranted as a matter of state law, counsel cannot be found to have been deficient for not requesting the instruction. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance[.]"). Accordingly, rejection of this claim was consistent with, and a reasonable application of, the Strickland standard.

IV.  REQUEST FOR EVIDENTIARY HEARING

Petitioner repeatedly requests an evidentiary hearing. Because none of his claims survive review under § 2254(d)(1), his request for an evidentiary hearing must be denied. See Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011) (holding that habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits).

V.  CONCLUSION

For the reasons discussed above, counsel's alleged errors, whether considered individually or cumulatively, do not constitute ineffective assistance. Because the state court's adjudication of petitioner's claims was not unreasonable within the meaning of § 2254(d), the petition for writ of habeas corpus should be denied.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why such a certificate should not issue. Fed. R. App. P. 22(b). For the reasons set forth in these findings and recommendations, petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, no certificate of appealability should issue.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 5, 2013

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

AC:ls//jord2438.157